# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00601-CV

**Y. G., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-FM-19-001970, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Y.G. (Father) appeals from the trial court's order of termination.[1] Following a jury trial, the trial court terminated Father's parental rights to his child, D.G.G. (Child), and appointed the Texas Department of Family and Protective Services as Child's permanent managing conservator. In six issues, Father challenges: (i) the sufficiency of the evidence to support the jury's predicate ground findings for termination, *see* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions or surroundings), (E) (endangering conduct), (O) (failing to comply with court-ordered services); (ii) the jury's finding that Father did not prove the affirmative defense in section 161.001(d) by a preponderance of the evidence, *see id.* § 161.001(d) (prohibiting termination for failure to comply with court-ordered services if parent proves he was unable to comply and made good faith effort to comply without fault); (iii) the

---

[1] We refer to Y.G. and his child by their initials or as Father and Child. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. We also refer to Child's mother as Mother. Mother's parental rights were terminated in the trial court's order, but she is not a party to this appeal.

sufficiency of the evidence to support the jury's finding that termination of Father's parental rights was in Child's best interest, *see id.* § 161.001(b)(2); and (iv) the sufficiency of the evidence to support a finding that Father should not have been appointed as Child's sole managing conservator or joint managing conservator with the right to determine residency. For the following reasons, we affirm the trial court's order of termination.[2]

## BACKGROUND

Father and Mother lived in Honduras when they began a sexual relationship around 2008. At that time, Father was in his forties and married with grown children, and Mother was seventeen with one son who lived with her mother. Mother and Father also had two sons together before Child was born in June 2017. Their first son was born around 2010, and their second son around 2012. Father provided a place for Mother and their sons to live until early 2017 when Mother, who was five or six months pregnant with Child, began staying with friends or relatives. After they separated, Father provided some financial support and visited with Mother and the children once or twice a month.[3]

In October 2018, Mother and sixteen-month-old Child entered the United States without visas with the assistance of smugglers or "coyotes," but Father stayed in Honduras with

---

[2] The attorney ad litem filed a motion to dismiss this appeal because Father's notice of appeal was filed more than 20 days after the order of termination was signed. We imply a motion to extend the time to file the notice of appeal because the notice of appeal was filed within the fifteen-day extension period and grant the implied motion. *See* Tex. R. App. P. 26.1(c), 26.3; *Verburgt v. Dorner*, 959 S.W.2d 615, 617–18 (Tex. 1997) (stating that "motion for extension of time is necessarily implied" when appellant acting in good faith files bond within fifteen-day period).

[3] Mother testified at trial that after they separated, Father brought money every week, "[l]ike $45, maybe less" but that it was "[n]ot enough." Evidence was conflicting about how often Father visited Mother and their children after they separated. Mother alleged that Father visited so that they could have sex.

their two sons and his other family. According to Mother, they traveled by bus and truck[4] and, at one point, the smugglers threw Child to the floor and Mother had guns pointed at her because the person who had brought them to that point was unable to locate the "clue, that code that they needed to let us in." After Mother and Child arrived in the United States, they were detained by immigration officials, but they were released after about one week pending further proceedings in immigration court. Mother and Child stayed with an aunt in the Dallas area but moved to the Austin area after about one month and lived with Mother's boyfriend.

In March 2019, the Department became involved with Mother and Child based on allegations that they were living in an apartment with no electricity or food, Mother was abusing drugs, and Mother was leaving Child with "drunk people for several hours at a time." Child was removed from Mother's care and placed with foster parents. The Department contacted Father shortly after Child was removed, but he stayed in Honduras, and the Child stayed with the foster parents, who intervened in the Department's case in April 2021.

Due in part to the COVID-19 pandemic, the trial court granted multiple extensions and conducted the jury trial by remote videoconference from August 23 to September 1, 2021.[5] The trial court also utilized an interpreter because the parents and other

---

[4] Mother testified inconsistently about the duration of their trip from Honduras to the United States.

[5] *See* Tex. Fam. Code § 263.401(a) (providing for automatic dismissal of suit filed by Department that requests termination or conservatorship unless court has commenced trial on merits or granted extension "on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator"), (b) (allowing extension that does not exceed 180 days from one-year dismissal); *First Emergency Order Regarding the COVID-19 State of Disaster*, 596 S.W.3d 265 (Tex. 2020) (dated March 13, 2020, stating that courts may "[m]odify or suspend any and all deadlines and procedures"); *Third Emergency Order Regarding the COVID-19 State of Disaster*, 596 S.W.3d 266, 267 (Tex. 2020) (dated March 19, 2020, clarifying that authorization to modify or suspend

witnesses primarily spoke Spanish. The witnesses included Mother, Father, Father's daughters, teachers and the principal from the school that Father and Mother's two sons attended in Honduras, the Department's supervisor and current caseworker assigned to the case, a psychologist who completed a psychological evaluation of Mother, the guardian ad litem, and the foster parents.

The Department did not seek to terminate the parents' rights but sought joint managing conservatorship of Father and the foster parents and possessory conservatorship for Mother, Father sought to be appointed sole managing conservator, and the attorney ad litem and the foster parents sought to terminate parental rights so that the foster parents could adopt Child. The Department's initial plan had been for Child to be returned to Father in Honduras, but the Department changed course after Mother alleged domestic violence by Father against her. Although the Department did not seek to terminate parental rights, it sought for Child to remain with the foster parents, seeking to have them appointed as joint managing conservators with the right to designate Child's primary residence. Concerning Father's parental rights, the caseworker testified that the Department was not seeking termination because it did not have enough information about his background to make that request and that her opinion was that she "thought it would be difficult for us to meet the legal burden as [she] understands it."

The evidence at trial established that four-year-old Child had been living with the foster parents during the whole case; that Child was bonded to the foster parents and thriving in their home; that the foster parents hoped to adopt Child if the parents' rights were terminated; and that they were willing to maintain a relationship between Child and the parents if it was safe

deadlines and procedures "applies to all proceedings under Subtitle E, Title 5, of the Family Code, and specifically, to the deadlines in Section 263.401").

4

and appropriate to do so. The evidence concerning Mother's actions during the case included that she used illegal drugs, did not have any contact with the Department or Child for an eleven-month period, and had very limited contact with her sons who were living with Father but that she had virtual visits with Child and one in-person visit for Child's birthday after she reconnected with the Department and Child. At the time of trial, Mother was not ready to take care of Child, but she and Child were bonded and loved each other, and Mother had developed a positive relationship with the foster parents that allowed her to talk to Child frequently.[6]

The evidence concerning Father's actions during the case included that he had not sent Child gifts or cards or provided financial support for her care and that the Department had been unable to obtain a home study on Father's home,[7] but that he was seeking to have Child returned to Honduras to live with him, that he had maintained contact with the Department by text or telephone during the case, and that he consistently had weekly virtual visits with Child that lasted between five and ten minutes. Father's virtual visits with Child, however, changed to supervised ones based on his conduct. The foster mother testified that when Father was speaking to Child during a visit, Father "started raising his voice at [Child]" to tell her to speak Spanish, Child's response was to "cower down," and that Father did not ask Child about her friends or interests during their calls. The foster mother also testified that Father scared her, made her "feel

---

[6] According to Mother, she talked to Child daily. Mother also testified that she loves the foster parents, did not have any concerns about their care of Child, and was "very thankful" to them, and the foster mother testified that Child was happy and "bubbly" when visiting with Mother.

[7] The Department's supervisor testified about the Department's unsuccessful attempts to obtain a home study on Father's home in Honduras. She explained that the Department had been trying to work "with the Honduran consulate and embassy over in Houston back and forth for years now, trying to get a home assessment done on [Father's] home in Honduras. We were not successful for a variety of reasons, some related to hurricanes that had hit the area and the global pandemic."

uncomfortable," and left her a "very eerie" and "threatening" message that "you cannot have what does not belong to you." The Department supervisor testified that she had heard Father "yelling during visits" and that he yelled at the foster parents, the caseworker, and Child. She testified that Father would yell at the foster parents that "they [were] going to regret trying to keep his child away from him and, um, ugly things in that general tone."

Although the guardian ad litem had "gone back and forth a little bit," she believed "at this time it is in [Child's] best interest to be adopted by [the foster parents]." The guardian ad litem testified about her concerns with Child going to live in Honduras and with Father, including his "attitude toward women" and his interactions with Child during their visits. The guardian ad litem "didn't get the feeling that father and daughter were getting to know each other." She testified that Father's visits were not really visits, that they were more like calls to check on Child. She further testified, "After listening to this trial I have become very concerned about taking [Child] from the only family she knows to a place that not only she doesn't know, to people she doesn't know." She also expressed concern that Father "had indicated a couple of times that if [Child] were to go and live with him, she will never see her mother," explaining that "[a]s flawed as [Mother] is, she is her mother, and this child has developed a bond with her." The guardian ad litem further testified that the foster parents were meeting Child's needs and that Child was happy in that placement.

The primary factual dispute at trial concerned Mother's allegations that Father physically and verbally abused her, including when she was pregnant with their children, and that his abuse continued after Child was born. Mother testified that Father provided her a place to stay in exchange for sex and that their relationship was good at first but became violent with him slapping and hitting her "many times" and "everywhere on [her] body" when she was

6

pregnant with her children and that he had threatened to kill her.[8]  She also testified that he hit her "all the time" when their sons were around and pushed her downstairs when she was pregnant with Child.  She called the police "[m]any times" seeking help but "they didn't do anything."  She further testified that she was afraid of Father and came to the United States so she "could escape to get away from him"[9]; that she and Father talked about the "risks" of coming to the United States with an infant the way that she did; and that after she was in the United States, Father continued to verbally abuse her, threatened to have her killed, and had not allowed her to have contact with her sons who lived with Father.  Mother also testified that before Child was born, she smoked marijuana each evening with Father after their sons were asleep.

Father denied Mother's allegations of physical and verbal abuse and drug use; testified that Mother called him during trial, apologized and asked for his forgiveness, and told him that she could "see that [her sons] are doing well"; and presented evidence that he was a caring and appropriate parent to his children in his care with sufficient financial resources to take care of his family. Father testified that he had a profitable fishing business and that his wife also worked; his three daughters testified about their relationships with him, their childhoods, and their lives; and the Honduran school officials testified that Father was a responsible, understanding parent who was a member of the parent-teacher association and that his sons were happy and doing well in school.  All three daughters described their Father positively, and the two oldest testified that Father was not violent or verbally abusive with them, but the youngest

---

[8]  Mother testified, "He will always, you know, make threats, telling me that I was his, that he would kill me if I tried to leave him."

[9]  Mother testified that she lied to Father that the plan was for her to come to the United States and then for him to join her there later "[b]ecause that was the only way that [she] could escape to get away from him."

testified that Father disciplined her by hitting her with a belt once on her legs "when it was needed" and disciplined her other siblings the "same way" except that he hit them "two or three" times with a belt because they were older.

As to Mother's plans to come to the United States, Father testified that he could not stop her so he arranged with his cousin who was a "coyote" to assist Mother and Child. Father testified that after Mother and Child were in the United States, he sent Mother $100 after she called and told him that she was not working and Child "didn't have Pampers or milk" and that he sent her "the next week $270" after she called him "again." After that, he "stopped helping her" and did not send further money because Mother's father called him and "told [him] not to do so because she was doing drugs." Father further testified that he had been unable to obtain a visa to travel to the United States after the Department removed Child but that he had obtained a private home study on his home.

The exhibits at trial included redacted orders in the case, photographs of Child and the parents, a video from Mother's in-person visit with Child for her fourth birthday, and audio recordings of voice messages from Father to Mother during the case.[10] Father called Mother a "damned bitch" and the "daughter of sixty thousand whores"; told her that he "realize[d] all [her] f…ing trashy life [she was] living damned" and that his "words may not hurt but it's going to hurt [her], daughter of a whore, what [she] did damned bitch"; "[swore] on [his] mother, daughter of a whore, only if God takes [his] life will [she] see [his] kids again, daughter of a whore"; and told her that their two sons "do not even call [her] mom" and "do not want to deal with [her]" or "to hear anything of [her] daughter of a whore."

---

[10] The audio recordings are in Spanish, but the exhibits included translations of the recordings.

The jury found that: (i) Father knowingly placed or knowingly allowed Child to remain in conditions or surroundings which endangered Child's physical or emotional well-being, (ii) Father engaged in conduct or knowingly placed Child with persons who engaged in conduct which endangered Child's physical or emotional well-being, (iii) Father failed to comply with court-ordered services, and (iv) it was in Child's best interest for Father's parental rights to be terminated.[11] *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). The jury also did not find that Father was unable to comply with the court-ordered services, that he made a good faith effort to comply with the services, or that the failure to comply was not attributable to any fault of Father. *See id.* § 161.001(d). The trial court thereafter signed the order of termination. Father filed a motion for new trial and a motion for judgment notwithstanding the verdict, which were overruled. This appeal followed.

## ANALYSIS

### Standard of Review

To terminate parental rights under section 161.001, the Department has the burden to prove one of the predicate grounds in subsection (b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is clear and convincing evidence. Tex. Fam. Code § 161.206(a); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). The clear and convincing evidence standard is "that measure or degree of

---

[11] The jury did not find that Father had failed to support Child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition. *See* Tex. Fam. Code § 161.001(b)(1)(F).

proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence").

Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

In our review of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (explaining that appellate court "should not supplant the jury's judgment with its own").

**Predicate Grounds**

In his first four issues, Father challenges the jury's predicate-ground findings, but we limit our review to his challenge to the legal and factual sufficiency of the evidence to

support the jury's findings under subsections (D) and (E)—that (i) Father knowingly placed or knowingly allowed Child to remain in conditions or surroundings which endangered Child's physical or emotional well-being, and (ii) Father engaged in conduct or knowingly placed Child with persons who engaged in conduct which endangered Child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis for appeal challenging subsection (D) or (E) finding); *In re A.V.*, 113 S.W.3d at 362 (explaining that Department has burden to prove one predicate ground and that termination is in child's best interest).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13–14 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.* at *14 (citing *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied)).

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied.). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.* In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* at *10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)); *see In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being. Domestic violence, lack of self-control, and a propensity for violence may be considered as evidence of endangerment." (internal citation omitted)). Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See V.P.*, 2020 Tex. App. LEXIS 938, at *11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503).

Father relies on the Department's decision not to seek termination; the evidence that it was the caseworker's opinion that the Department "did not meet the burden of proof to

12

proceed on any given termination ground" against Father, who was the "non-offending parent"[12] and unable to travel to the United States; and the lack of corroborating evidence that Father committed domestic violence against Mother. Father argues that the "only source of any allegations" of "endangering behavior" was from Mother and that other than her testimony, "there is no other real, testimonial, demonstrative or documentary evidence to support [Mother's] allegations of [his] propensity for violence or conduct that would endanger [Child]," such as records of police involvement. He also argues that "there simply is insufficient evidence to deduce that the actual home environment was in and of itself endangering," that this Court should not consider the evidence surrounding Mother's entry into the United States, that the "contested" evidence of his abuse prior to and after Child's birth "was limited to [Father] occasionally speaking meanly to [Mother] and in a derogatory manner," and that there was no evidence that Father knew of Child's living conditions in the United States or that Mother was using illegal drugs.

We, however, must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *See In re A.B.*, 437 S.W.3d at 503. Mother and Father provided conflicting versions of what happened during their relationship, and it was for the jury to resolve the conflicting evidence and the credibility of the witnesses and to decide who and what to believe. *See id.* Although Father denied Mother's allegations, Mother testified about Father's ongoing physical abuse, including hitting her all over her body when she was pregnant with her children and pushing her downstairs when she was pregnant with Child, and

---

[12] The caseworker testified that the Department would label Father as a "non-offending parent," meaning "that he was not involved in the incident that led to the removal of the child."

about his verbal abuse before and after she left Honduras, including testifying about the messages that he left her and other abusive statements that he made in front of their sons. *See In re J.I.T.P.*, 99 S.W.3d at 845 (explaining that domestic violence and propensity for violence may be considered as evidence of endangerment); *see also S.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00191-CV, 2021 Tex. App. LEXIS 7002, at *20–21 (Tex. App.—Austin Aug. 25, 2021, no pet.) (mem. op.) (affirming trial court's findings under subsections (D) and (E) and citing evidence of "repeated domestic violence"); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.— Houston [14th Dist.] 2014, pet. denied) (noting that physical violence or abusive conduct by one parent to other can create endangering environment); *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("Domestic violence may be considered evidence of endangerment. If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct." (internal citations omitted)).

Mother's version of her relationship with Father also was consistent with his messages to her, which the jurors were able to hear for themselves. Father admitted that he left those messages about three months after Child was removed, providing an explanation to the jury for why he left the messages,[13] but denied that he ever used that type of language when speaking with Mother in Honduras. The jury reasonably could have found Father's testimony not believable. The jury also could have credited the evidence that Father disciplined his

---

[13] Father testified that after Child was removed, he did not want to have any communications with Mother but that she called him about three months after Child was removed and "through a video camera, showing [him] her and her partner laying down in bed." He testified that on the video camera, she "showed herself" and said "this is a real man and he has it like a real donkey. And she made [Father] mad, um, you know, trying to make [her partner] look like a superman." He then explained that his "ego got infuriated" and "that's when [he] expressed everything that you heard there."

14

daughters by hitting them with a belt and that Father made threatening statements to the foster mother and raised his voice to Child during their visits causing Child to "cower down." *See In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (explaining that abusive conduct by parent can produce endangering environment and that "evidence that a person has engaged in abusive and violent conduct in the past permits an inference that the person will continue to engage in violent behavior in the future").

The jury also could have credited the evidence concerning other aspects of Father's relationships with Mother and Child. Father admitted that his relationship with Mother began when Mother was a teenager and Father was married and in his forties; that he obtained the assistance of a smuggler for Mother and Child to come to the United States, despite the risks involved; and that after Mother and Child were in the United States but before Child was removed from Mother's care, he knew that Mother was unable to care for Child's needs—testifying that she called to tell him that she did not have money to buy Child "Pampers or milk"—and that she was using illegal drugs—testifying that Mother's father told him about her drug use—but he allowed Child to remain in Mother's care. *See Pruitt*, 2010 Tex. App. LEXIS 10272, at *20 (considering evidence that parent left children with unsuitable person to be relevant to issue of endangerment); *see also In re J.J.W.*, No. 14-18-00985-CV, 2019 Tex. App. LEXIS 3329, *19–20 (Tex. App.—Houston [14th Dist.] Apr. 25, 2019, pet. denied) (mem. op.) ("A parent endangers her children by accepting endangering conduct of other people.").

Other evidence also showed that Mother was dependent on Father for housing and financial support in exchange for sex during their relationship in Honduras, that they smoked marijuana together daily before Child was born, that Father had limited contact with Child before and after Child moved to the United States, that Father provided limited support for Child prior

15

to and during the case, and that Father interfered with Mother's relationship with her sons. *See V.P.*, 2020 Tex. App. LEXIS 938, at \*9–10 (explaining that inappropriate conduct may be considered endangering); *In re M.D.M.*, 579 S.W.3d at 765 (explaining that factfinder may infer that parent's lack of contact with child and absence from child's life "endangered the child's emotional well-being"); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct.").

Viewing the evidence under the applicable standards of review, we conclude that the evidence was legally and factually sufficient to support the jury's findings that Father knowingly placed or knowingly allowed Child to remain in conditions or surroundings which endangered Child's physical or emotional well-being and that he engaged in conduct or knowingly placed Child with persons who engaged in conduct which endangered Child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d at 232–33, 237; *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule Father's first and second issues and do not reach his third and fourth issues addressing subsection (O). *See* Tex. Fam. Code § 161.001(b)(1)(O), (2); *In re N.G.*, 577 S.W.3d at 232–33.

**Best Interest**

In his sixth issue, Father challenges the legal and factual sufficiency of the evidence to support that termination of his parental rights was in Child's best interest. *See* Tex. Fam. Code § 161.001(b)(2).

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the

emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28; *Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23.

Father argues that the "principal evidence" in favor of the jury's best interest finding was the amount of time that Child has lived with the foster parents. At the time of trial, Child was four and had been living with the foster parents for over two years. The evidence showed that Child was safe, well-cared for, and bonded with them; that they wanted to adopt Child; and that they were willing to allow the parents to visit with Child if it was safe and appropriate. Father does not dispute that the evidence showed that the foster parents have the parenting skills to take care of Child, are stable, and love Child and that Child loves them. He argues that the circumstances that allowed Child to be with the foster parents were "outside [his] control and free of his fault," citing the global pandemic, weather events, his inability to enter the United States legally, and the "bureaucratic nightmare," in contrast with the evidence of what he did have "control over"—"how he cares for his children." Father presented evidence that he has

17

been a loving, caring, and responsible father to his children who live in Honduras; that he had arranged for Child to go to school where his sons attend in Honduras and to receive therapy during her transition; and that his family would support and be part of Child's life.

The jury, however, could have credited the guardian ad litem's testimony that it was in Child's best interests for the parents' rights to be terminated and for the foster parents to adopt Child. The guardian ad litem testified that she did not have concerns with the foster parents' care of Child and that Child was happy and meeting her milestones in the foster parents' care. In contrast, she raised concerns about Father's attitude toward women and his lack of a relationship with Child. She explained that the visits that she observed between Father and Child were not really visits, that they were more like calls to check to see how Child was. She also expressed concern that if Child was returned to Father, he would not allow Child to have further contact with Mother. Although Mother was not able to care for Child at the time of trial, she was bonded with Child and had a positive relationship with the foster parents who were willing to allow Child to maintain a relationship with Mother going forward. *See Holley*, 544 S.W.2d at 371–72 (listing emotional and physical needs of child now and in the future and plans for child by individual or agency seeking custody among factors to consider in best interest determination).

The jury further could have considered the evidence of Father's violent past conduct directed at Mother, including pushing Mother downstairs when she was pregnant with Child and abusing Mother in the presence of their children, in its best interest determination. *See id.* (listing emotional and physical danger to child now and in future among factors to consider in best interest determination); *In re C.H.*, 89 S.W.3d at 27 (explaining that evidence presented to satisfy predicate ground may also be probative of best interest); *In re A.A.H.*,

18

Nos. 01-19-00612-CV & 01-19-00748-CV, 2020 Tex. App. LEXIS 1915, *37 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.) (explaining that "parent's past conduct is probative of his future conduct when evaluating the child's best interest" and that "factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child").

Viewing the evidence under the legal sufficiency standard of review, we conclude that the jury could have reasonably formed a firm belief or conviction that terminating the parental rights of Father was in Child's best interest. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31; *In re J.F.C.*, 96 S.W.3d at 266. Further, viewing the evidence under the factual sufficiency standard of review, we conclude that the evidence is such that the jury reasonably could have formed a firm belief or conviction that termination of Father's parental rights was in Child's best interest. *See In re A.C.*, 560 S.W.3d at 631. Thus, we conclude that the evidence was legally and factually sufficient to support the jury's best interest finding. We overrule Father's fifth issue.

**Conservator**

In his sixth issue, Father challenges the legal and factual sufficiency of the evidence to support a finding that he should not have been appointed the Child's sole managing conservator or joint managing conservator with the right to determine residency. In its order of termination, the trial court appointed the Department as the permanent managing conservator of Child.

"In contrast to termination findings, conservatorship determinations are governed by a preponderance-of-the-evidence standard." *In re C.N.S.*, No. 14-14-00301-CV, 2014 Tex.

App. LEXIS 8612, at *8 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.) (citing *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007)). "The appointment of a conservator is subject to review for abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable." *Id.*

Because the jury found that the parents' rights should be terminated and the trial court ordered that the parents' rights were terminated, the trial court was required to appoint the Department or another permissible adult or agency as Child's managing conservator. *See* Tex. Fam. Code § 161.207(a) ("If the court terminates the parent-child relationship with respect to both parents . . ., the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child."). Based on our review of the evidence supporting the jury's findings, we conclude that the trial court did not abuse its discretion when it appointed the Department as Child's managing conservator. *See id.*; *In re C.N.S.*, 2014 Tex. App. LEXIS 8612, at *33 (concluding that trial court did not abuse its discretion in appointing Department as children's managing conservator based on evidence supporting termination of parental rights); *see also In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (explaining that appointment of Department as child's managing conservator may be considered consequence of termination). We overrule Father's sixth issue.

**CONCLUSION**

For these reasons, we affirm the trial court's order of termination.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed: April 19, 2022